James A. Hunter (JH-1910)
HUNTER & KMIEC
255 West 94th Street, No. 10M
New York, New York  10025
Tel:      (646) 666-0122
Fax:      (646) 462-3356
E-Mail: hunter@hunterkmiec.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA ANN GABRIELE CHECHELE,<br><br>Plaintiff,<br><br>– v. –<br><br>THOMAS G. DUNDON,<br><br>Defendant,<br><br>– and –<br><br>SANTANDER CONSUMER USA HOLDINGS INC.,<br><br>Nominal Defendant. | ECF CASE<br><br>No. \_\_\_\_\_19-cv-10544\_\_\_\_\_<br><br>COMPLAINT FOR RECOVERY OF SHORT-SWING PROFIT UNDER 15 U.S.C. § 78p(b) |

Plaintiff Donna Ann Gabriele Chechele ("Plaintiff"), by her undersigned

attorneys, pleads for her complaint as follows:

**INTRODUCTION**

1.      This is an action for disgorgement under Section 16(b) of the

Securities Exchange Act of 1934, as amended (the "Act"), 15 U.S.C. § 78p(b).

2.      Section 16 is the "original and only express 'insider' trading

provision[]" of the Act.  Richard W. Jennings et al., Securities Regulation: Cases and

Materials 1202 (8th ed. 1998).  It aims to "prevent[] the unfair use of information that may have been obtained by [an insider] by reason of his relationship to the issuer."  *Id.* § 78p(a).

3.      Section 16 applies to the directors and officers of any issuer of a class of publicly traded equity securities.  *Id.* § 78p(a), (b).  It also applies to every beneficial owner of more than 10% of any such class.  *Id.*  Under Section 16(b), these "insiders" must disgorge to the issuer any profit they realize from a purchase and sale, or a sale and purchase, of the issuer's equity securities occurring within a period of less than six months.  *Id.* § 78p(b).  If an insider fails to disgorge this "short-swing" profit, the statute empowers the issuer, or "the owner of any security of the issuer," to bring suit to recover it.  *Id.*

4.      Liability under Section 16(b) is strict.  The profit from a short-swing transaction must be disgorged "irrespective of any intention on the part of [the insider] in entering into such transaction."  *Id.*  Recovery never depends on proof of scienter, a breach of duty, or the actual misuse of inside information.  *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972).

5.      Plaintiff, a stockholder of Nominal Defendant Santander Consumer USA Holdings Inc. (the "Issuer"), brings this suit against the Issuer's former executive Thomas G. Dundon ("Dundon").  While subject to Section 16 of the Act, Dundon realized more than $2.4 million in short-swing profit from his purchase and sale of the Issuer's common stock.  Under Section 16(b), this profit is now the Issuer's lawful property, which Dundon is strictly liable to account for and repay.

## JURISDICTION AND VENUE

6.      Jurisdiction is conferred on this Court by Section 27 of the Act, 15 U.S.C. § 78aa, and by 28 U.S.C. § 1331.

7.      Venue lies in this District under Section 27 of the Act and 18 U.S.C. § 1401 (a) because the Issuer transacts significant business in this District; (b) because the transaction described in paragraph 60(b) below was completed in whole or in part in this District, through the New York Branch of Banco Santander, S.A.; and (c) because the Issuer could have sued Dundon in this District.

## THE PARTIES

### The Parties to This Action

8.      Plaintiff is a natural person and resident of the State of New Jersey. Plaintiff has been a stockholder of the Issuer at all times since November 2017.

9.      Defendant Dundon is a natural person and a resident of the State of Texas.

10.     Nominal Defendant Santander Consumer USA Holdings Inc., which Plaintiff refers to as the "Issuer," is a corporation formed under the law of the State of Delaware with a principal place of business located in Dallas, Texas.  Plaintiff brings this action in the right and for the benefit of the Issuer, which is named as a nominal defendant solely to bring all necessary parties before the Court.

### Other Relevant Parties

11.     Santander Holdings USA, Inc. (the "Santander HoldCo") is a corporation formed under the law of the Commonwealth of Virginia with a principal place of business located in Boston, Massachusetts.  At all relevant times, the Santander

HoldCo beneficially owned a majority of the outstanding shares of the Issuer's common stock.

       12.    Banco Santander, S.A. ("<u>Banco Santander</u>") is a *sociedad anónima* formed under the law of the Kingdom of Spain with a principal place of business located in Madrid, Spain.  Banco Santander formed the Santander HoldCo as a holding company for Banco Santander's American operations, including Banco Santander's indirect investment in the Issuer.  At all relevant times, the Santander HoldCo was a wholly owned subsidiary of Banco Santander.

       13.    DDFS LLC (the "<u>Dundon HoldCo</u>") is a limited liability company formed under the law of the State of Delaware with a principal place of business located in Dallas, Texas.  The Dundon HoldCo serves as an investment vehicle for Dundon, who wholly owns and controls it.

       14.    Figure 1 below illustrates the relationship between the persons described in paragraphs 8-13 above:



Figure 1. Relationship Among the Parties and Other Relevant Persons (Parties in Gray).

## FACTS

### Background

15.     The Issuer is a consumer finance company specializing in vehicle finance and third-party servicing.  Through its consolidated subsidiaries, the Issuer originates, securitizes, and services consumer auto loans.

16.     The Issuer's predecessor company was founded in 1995 by a group of auto industry entrepreneurs including Dundon.  The "Santander" mark was adopted in 2006, when Banco Santander acquired a majority interest in the business.

17.     In January 2014, the Issuer completed an initial public offering of its common stock and became a public company.  The stock was listed on the New York Stock Exchange and registered under Section 12 of the Act, 15 U.S.C. § 78*l*, remaining so listed and registered at all times since.

18.     Immediately after the IPO, the Dundon HoldCo owned about 10% of the Issuer's common stock while the Santander HoldCo owned about 60%.  Other investors, including "retail" investors like Plaintiff, owned the rest.

19.     Dundon served as the Chairman and Chief Executive Officer of the newly public company.

### The Shareholders Agreement

20.     In preparation for the IPO, the Issuer entered into a Shareholders Agreement dated January 28, 2014 with Dundon, the Dundon HoldCo, Banco Santander, the Santander HoldCo, and another pre-IPO investor (the "Shareholders Agreement").

21.     True and correct copies of the Shareholders Agreement, together with its amendments of May 20, 2015, July 2, 2015, and August 31, 2016, are attached as Exhibits A-1, A-2, A-3, and A-4 to this Complaint.  The copies are supplied in the forms

in which Plaintiff's counsel downloaded them from the SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system.

22.     The Shareholders Agreement set the terms on which the pre-IPO investors would cooperate in managing the Issuer after it became a public company. The agreement also spelled out certain financial obligations that the Issuer and its pre-IPO investors owed one another.

23.     Article III of the Shareholders Agreement addressed a possible buyout of the Dundon HoldCo's investment in the Issuer. Section 3.1(b) entitled the Santander HoldCo to purchase the Dundon HoldCo's shares upon any termination of Dundon's employment with the Issuer (the "Santander Call Option"). Ex. A-1 at 15. Section 3.1(a) entitled the Dundon HoldCo, under similar circumstances, to sell its shares to the Santander HoldCo. *Id.*

### Dundon's Departure and the Separation Agreement

24.     On July 2, 2015, Dundon resigned as the Issuer's Chairman and Chief Executive Officer.

25.     The terms of Dundon's separation were memorialized in a letter agreement of July 2, 2015 among Dundon, the Dundon HoldCo, Banco Santander, the Santander HoldCo, the Issuer, and the Issuer's principal operating subsidiary (the "Separation Agreement").

26.     True and correct copies of the Separation Agreement, together with its amendments of July 20, 2015 and August 31, 2016, are attached as Exhibits B-1, B-2, and B-3 to this Complaint. The copies are supplied in the forms in which Plaintiff's counsel downloaded them from the SEC's EDGAR system.

27.     The Separation Agreement laid out the benefits and other compensation Dundon was owed at the time of his resignation.  This compensation included a stock option to acquire 759,773 shares of the Issuer's common stock at $24.00 per share (the "Dundon Stock Option").  Ex. B-1 sched. A at A-2.  Section 2(b)(ii) of the Separation Agreement entitled Dundon to exercise his options, including the Dundon Stock Option, for three years, until July 2, 2018.  Ex. B-1 at 2.

28.     Section 2(b)(ii) also allowed Dundon to settle his stock options in cash if he exercised them promptly, originally before September 30, 2015.  *See id.*; *see also* Ex. B-2 § 1 (retroactively amending this deadline to July 3, 2015).  Cash settlement would allow Dundon to realize the value of his options without taking physical delivery of the underlying stock.  If Dundon elected cash settlement, then the Issuer would pay him a cash amount equal to the difference between the closing price of the stock the day before exercise and the exercise price of the option.

29.     For example, suppose Dundon elected cash settlement of his options the day after the Issuer's stock closed at $25.00 per share.  To settle the Dundon Stock Option, the Issuer would pay him ($25.00 – $24.00) x 759,773 = $759,773.  This cash payment would leave Dundon in the same position as if he had paid the exercise price in cash ($24.00 per share), taken delivery of the underlying stock (759,773 shares), and immediately resold the stock to the Issuer at its market price ($25.00 per share).

30.     The Separation Agreement also served as an exercise notice for the Santander Call Option.  Section 5(b) announced that "this letter constitutes the delivery as of July 3, 2015 of an Employment Call Option Notice (as defined in the Shareholders Agreement) for all purposes under the Shareholders Agreement."  Ex. B-1 at 4.

31.     Under the formula of the original Shareholders Agreement signed in 2014, the exercise price for the Santander Call Option would have been the mean daily volume-weighted average price of the Issuer's publicly traded common stock over the ten trading days preceding exercise.  *See* Ex. A-1 § 3.3(a) at 16; *id.* § 1.1 at 2, 12.  That price would have been $26.17 per share.

32.     But Dundon succeeded in renegotiating that formula when he resigned.  The Separation Agreement hiked the exercise price from a volume-weighted average to the *highest intraday trading price* of the common stock over the ten trading days preceding exercise.  *See* Ex. B-1 § 5(b) at 4; *see also* Ex. A-3 § 1 (amending the Shareholders Agreement to reflect the new price).  The revised price worked out to $26.83 per share.  Ex. A-3 § 1.

33.     Although the Separation Agreement formalized the purchase of the Dundon HoldCo's shares as a unilateral exercise of the Santander Call Option, we know that Dundon did not oppose the transaction.  On a conference call with investors on July 2, 2015, the Issuer's newly minted Chief Executive Officer Jason Kulas described the exercise of the Santander Call Option as a "mutual decision between Santander and [Dundon]."

**The Regulatory Conditions**

34.     Completion of the transactions contemplated in the Separation Agreement was not guaranteed.  As regulated financial companies, both the Santander HoldCo and the Issuer would need government approval for the significant cash disbursals required to close the exercise of the Santander Call Option and any cash settlement of the Dundon Stock Option.  The agreement expressly conditioned both transactions on the receipt of these approvals.  *See* Ex. B-1 § 2(b)(ii) at 2; *id.* § 5(d) at 5.

35.     Dundon was not expected to be an idle spectator of the regulatory

campaign.  Although he had resigned from his executive positions, he remained a director

of the Issuer and its paid consultant.  As the Issuer's director, founder, and advisor, and

lately its Chairman and Chief Executive Officer, Dundon had a hand in helping the Issuer

wrangle the necessary approvals.

36.     The agreements Dundon signed confirm that the regulatory process

was understood as a team effort.  Section 3.3(g) of the Shareholders Agreement had long

obligated "[e]ach of the parties" to "use commercially reasonable efforts to secure any

necessary consent from applicable Governmental Authorities" for any exercise of the

Santander Call Option.  Ex. A-1 at 18.  Section 5(d) of the Separation Agreement now

obligated "[t]he parties" to use their "reasonable best efforts to obtain all required bank

regulatory approvals, if any, and any other approvals required by law."  Ex. B-1 at 5.

37.     Dundon did not have to worry if the regulatory process dragged

out.  Although the shares underlying the Dundon Stock Option were effectively frozen

until all regulatory conditions were satisfied, the Separation Agreement gave Dundon a

valuable "out" to monetize the bonanza of shares covered by the Santander Call Option.

Under Section 5(e) of the agreement, the Dundon HoldCo had the right to "transfer, sell

or otherwise dispose of any or all shares" underlying the Santander Call Option if the

exercise of the option was not completed by October 15, 2015.  Ex. B-1 at 5.

38.     These provisions made Dundon the master of his fate.  As one of

the Issuer's directors and largest stockholders, he already had some pull to nudge the

approval process along.  If he grew impatient with it, he could unload the Dundon

HoldCo's shares on the open market any time after October 15, 2015.  And if he felt no

rush (or if the market tanked), he could wait for government approval and complete the

sale to the Santander HoldCo at the price set in the Separation Agreement.

### The Decline in the Issuer's Stock Price

39.     It turns out that Dundon timed his departure perfectly.  The

Issuer's stock price had crept steadily higher in the months leading up to his departure,

and in its wake the stock sank like a stone.  The perfection of Dundon's timing is

apparent from Figure 2 below, which charts the closing price of the Issuer's common

stock from the January 2014 IPO through the major events of this case:



Figure 2. Historical, Dividend-Adjusted Price of Santander Consumer USA
Holdings Inc. Common Stock (NYSE: SC) (Chart Source: StockCharts.com).

40.     As Figure 2 shows, the Separation Agreement pegged the exercise

price of the Santander Call Option at a near-term high.  The Issuer's common stock had

never touched $26.83 per share before the summer of 2015, and it would not crest that

mark again until July 2019.  The "highest intraday trading price" in the ten trading days

before July 2, 2015 proved to be the highest price the common stock would *ever* reach in the first five years of the Issuer's existence.

41.     The swoon in the stock price meant that the Santander HoldCo was now grossly overpaying for Dundon's shares.  By March 2016, the stock was languishing near $9.00 per share, sticking the Santander HoldCo with a bill for $26.83 – $9.00 = $17.83 per share more than it was worth.  With the Dundon HoldCo sitting on 34.6 million shares, the Santander HoldCo was more than $600 million in the hole.

42.     The market gyre also sucked down Dundon's stock options.  The exercise prices of the options ranged from a low of $9.21 per share to, in the case of the Dundon Stock Option, $24.00 per share.  With the Issuer's stock plumbing $9.00 per share, these options had no intrinsic value.  To exercise them, Dundon would have to pay more for the underlying stock than it was worth.

43.     But recall that the Separation Agreement gave Dundon the right to settle his options in cash if he delivered a prompt exercise notice.  Though not mentioned in the Separation Agreement, he delivered an exercise notice on July 2, 2015, the same day the agreement was signed.  The exercise notice elected cash settlement, valuing the underlying stock not at its March 2016 price but at its market price on July 1, 2015 — $26.48 per share.

44.     Once again, Dundon had timed the market perfectly.  No sooner had he negotiated the cash settlement right than he capitalized on it, saddling the Issuer with a purchase obligation when the stock was trading near an all-time high.  If and when the exercise was completed, the Issuer would need to pay Dundon the difference between $26.48 per share and the applicable exercise price for each option.  With options on more

than 6.8 million shares at strikes as low as $9.21 per share, Dundon might pocket more than $100 million to settle options that, intrinsically, were worthless.

### The Settlement Agreement

45.     Dundon resigned from the Issuer's board of directors on April 1, 2016.

46.     With his resignation from the board, Dundon's role at the Issuer reduced to a consultancy, an offsite gig that required no facetime in the office.  His contract was to end three months hence, on July 2, 2016, and could be terminated early at the Issuer's election.  *See* Separation Agreement § 4(e), Ex. B-1 at 3-4.  His tenure at the Issuer was all but over.

47.     As the Issuer slipped from his grip, Dundon's counterparties moved to restructure the onerous obligations of the Settlement Agreement.

48.     The first significant amendment was negotiated in August 2016.  It lowered the exercise price of the Santander Call Option from $26.83 per share to $26.17 per share.  *See* Ex. A-4 § 1; Ex. B-3 § 1.

49.     The new exercise price was actually the old one: it was the same price the Santander HoldCo would have paid under the formula of the original Shareholders Agreement, had that formula not been amended in 2015 by the Separation Agreement.  *Compare* Ex. A-4 § 1 *with* Ex. A-1 § 3.3(a) at 16; *id.* § 1.1 at 2, 12.  While the 2016 retrenchment knocked just $0.66 per share off the exercise price, it promised to save the Santander HoldCo more than $20 million on the purchase of the Dundon HoldCo's 34.6 million-share hoard.

50.     Further relief came when Banco Santander took assignment of the Santander Call Option.  The assignment, made in August 2016, cleared the Santander

HoldCo's books of a massive liability, now hundreds of millions of dollars underwater. With a market capitalization of nearly $75 billion, Banco Santander was better positioned than its subsidiary to absorb the hit, and Plaintiff alleges on information and belief that regulatory considerations partly motivated the assignment.

51.     These measures, however, did not slake the buyers' remorse of Dundon's counterparties.  By 2017 they were pressing for a full renegotiation of the Separation Agreement.  Their exertions came to fruit in a Settlement Agreement and Release dated November 15, 2017 (the "<u>Settlement Agreement</u>").

52.     A true and correct copy of the Settlement Agreement is attached as Exhibit C to this complaint.

53.     The Settlement Agreement recited that "disputes and differences ha[d] arisen" among the parties to the Separation Agreement.  Ex. C recitals at 2.  These disputes centered on "the transactions and payments" compassed in the Shareholders Agreement, the Separation Agreement, and the parties' other agreements.  *Id.*

54.     The Settlement Agreement comprehensively resolved these disputes, effectively novating its parties' earlier accord.  According to its integration clause, the Settlement Agreement "constitutes the entire agreement among the parties with respect to the subject matter hereof, and, unless otherwise specifically provided in this Agreement, supersedes and replaces all prior representations, negotiations, proposed agreements, agreements, and communications, whether written or oral, express or implied."  Ex. C § 12 at 7.

55.     Under Section 1(A) of the Settlement Agreement, Banco Santander agreed to complete the exercise of the Santander Call Option with a gross payment of

$941,945,420, or about $27.225 per share for all 34,598,506 shares then owned by the

Dundon HoldCo.  Ex. C at 2.  In return, Dundon agreed to apply a portion of the sale

proceeds to repay $294,500,518 due on a loan from Banco Santander, leaving the

Dundon HoldCo with a net, pretax payment of about $647 million.  Ex. C § 1(B) at 2.

56.     Section 1(C) of the Settlement Agreement revisited Dundon's July

2015 exit package.  Under Section 1(C)(b), the cash settlement terms of his stock options

were amended by effectively reducing the cash value of the underlying stock from $26.48

per share (the price set under the Separation Agreement) to just $19.18 per share.  Ex. C

at 3.  In the case of the Dundon Stock Option, the amendment meant that Dundon would

be giving the Issuer $24.00 per share in value to get only $19.18 per share in cash.

57.     The parties also exchanged mutual releases and agreed to terms

(nondisparagement, noncompetition, confidentiality) customary for the settlement of an

employment-related dispute.  Ex. C §§ 2-3 at 4-5; *id.* § 5 at 6; *id.* § 9 at 7.  These terms

were indispensable to achieving "a reasonable final settlement" that would avoid the

"time, distraction and expense . . . of litigation or arbitration."  *Id.* recitals at 2.

58.     Finally, the Settlement Agreement marked receipt of the long-

elusive "bank regulatory approvals."  Ex. C recitals at 1.  According to the recitals, the

final regulatory condition was satisfied "upon and as a result of the full execution" of the

Settlement Agreement itself.  *Id.*  The agreement scheduled a closing for November 15,

2017, to follow immediately after signing.  *See id.* § 1(A) at 2.

### The November 2017 Transactions

59.     And so, on November 15, 2017, the transactions first negotiated in

July 2015, and conceived years earlier, were comprehensively reworked, freshly reduced

to writing, cleared over their final regulatory hurdle and, at last, consummated.

-14-

60.     The transactions completed on November 15, 2017 pursuant to the

Settlement Agreement included the following:

(a)     **The Exercise of the Dundon Stock Option.**  Dundon

purchased from the Issuer 759,773 shares of its common stock at a price of $24.00

per share; and

(b)     **The Exercise of the Santander Call Option.**  The Dundon

HoldCo sold to Banco Santander 34,598,506 shares of the Issuer's common stock

at a price of $27.225 per share.

61.     The price of the Issuer's publicly traded common stock closed at

$16.28 per share on November 15, 2017, below the exercise prices of both the Dundon

Stock Option and the Santander Call Option.

62.     The payments necessary to fund the exercise of the Santander Call

Option and the exercise and settlement of the Dundon Stock Option were netted with one

another and with the other crisscrossing transfers dictated by the Settlement Agreement.

When all was said and done, Dundon received pretax payments totaling approximately

$713 million.

63.     The Issuer disclosed the Settlement Agreement and its closing in a

filing with the SEC on November 17, 2017.  The filing cast the agreement as "alter[ing]

certain portions of the economic arrangements set forth in the Separation Agreement."  It

crowed that the alterations had saved the Issuer approximately $50 million.

### Dundon's Disclosure
### and Plaintiff's Demand

64.     On November 17, 2017, Dundon filed a Statement of Changes in

Beneficial Ownership on Form 4 with the SEC (the "Form 4").  Later that day, he filed a

second statement amending the first one (the "First Form 4 Amendment").  Each of these statements was signed by Dundon.

65.     The First Form 4 Amendment added explanatory footnotes omitted from the earlier filing and corrected an arithmetical error in Table II, but in all other respects the two statements were identical.

66.     True and correct copies of the Form 4 and the First Form 4 Amendment, in the respective forms in which Plaintiff's counsel downloaded them from the SEC's EDGAR system, are attached as Exhibits D-1 and D-2 to this complaint.

67.     The Form 4 and First Form 4 Amendment disclosed every transaction Dundon had completed in the Issuer's equity securities on November 15, 2017.  The transactions included the exercise of the Santander Call Option and the exercise of the Dundon Stock Option.

68.     On both the Form 4 and First Form 4 Amendment, Dundon recorded the exercise of the Dundon Stock Option with transaction code "O."

69.     According to SEC instructions, persons completing Form 4 must use transaction code "O" to disclose the "[e]xercise of [an] out-of-the-money derivative security."  Form 4 General Instruction 8, *available at* https://www.sec.gov/about/forms/form4data.pdf.

70.     Based in part on the disclosure in the Form 4 and First Form 4 Amendment, Plaintiff's counsel made a Section 16(b) demand on the Issuer by letter of November 30, 2017 (the "Demand").

71.     A true and correct copy of the Demand is attached as Exhibit E to this complaint.

72.     The Demand alleged that Dundon's purchase of the Issuer's common stock through the exercise of the Dundon Stock Option was matchable under Section 16(b) of the Act with his indirect sale of the Issuer's common stock through the exercise of the Santander Call Option.  Ex. E at 1.  With respect to the Dundon Stock Option, the Demand added that "[n]o exemption is available for the exercise of this option because the option was out of the money."  *Id.* ex. A. n. 1.

73.     The Demand requested "an accounting and disgorgement of all profit recoverable from Mr. Dundon under the Act as a result of all such transactions." Ex. E at 1.  It estimated the recoverable profit at not less than $2,450,267.  *Id.*

74.     On January 29, 2018, in response to the Demand, Dundon filed a new Statement of Changes in Beneficial Ownership on Form 4 relating to the November 15, 2017 transactions (the "Second Form 4 Amendment").

75.     A true and correct copy of the Second Form 4 Amendment, in the form in which Plaintiff's counsel downloaded it from the SEC's EDGAR system, is attached as Exhibit F to this complaint.

76.     The Second Form 4 Amendment revised the transaction code for the exercise of the Dundon Stock Option.  In place of the "O" from the earlier forms, Dundon now reported an "X".

77.     According to SEC instructions, persons completing Form 4 must use transaction code "X" to disclose the "[e]xercise of [an] in-the-money or at-the-money derivative security."  Form 4 General Instruction 8, *available at* https://www.sec.gov/about/forms/form4data.pdf.

78.     Put simply, Dundon had amended his earlier disclosure to recharacterize the exercise of the Dundon Stock Option from "out-of-the-money" to "in-the-money."

79.     His motive for doing so is plain: SEC Rule 16b-6(b) exempts the purchase of stock through the exercise of an option or other "call equivalent position," but not if the option is out-of-the money.  The rule provides in pertinent part as follows:

> [T]he acquisition of underlying securities at a fixed exercise price due to the exercise or conversion of a call equivalent position . . . shall be exempt from the operation of section 16(b) of the Act: *Provided, however,* That the acquisition of underlying securities from the exercise of an out-of-the-money option, warrant, or right shall not be exempt unless the exercise is necessary to comport with the sequential exercise provisions of the Internal Revenue Code.

17 C.F.R. § 240.16b-6(b).

80.     Dundon was right the first time.  The Dundon Stock Option was exercised out of the money, because its exercise price far exceeded the price of the underlying common stock on November 15, 2017, when the transaction took form and became a reality.  For that is when Dundon signed the Settlement Agreement that ultimately governed the exercise of the Dundon Stock Option; when he became irrevocably bound to exercise the option on the agreed terms; when all material conditions to exercise were finally satisfied; and when the exercise was actually achieved.

81.     The Demand has fallen on deaf ears.  More than 60 days having passed since it was made, Plaintiff reluctantly submits the matter to this Court.

-18-

**SOLE CLAIM FOR RELIEF:**
**DISGORGEMENT UNDER 15 U.S.C. § 78p(b)**
**(AGAINST DEFENDANT DUNDON)**

82.     Plaintiff realleges and incorporates by reference the allegations in

paragraphs 1-81 above.

83.     Section 16(b) of the Securities Exchange Act of 1934, as amended,

reads in pertinent part as follows:

> For the purpose of preventing the unfair use of information which
> may have been obtained by [a 10 percent] beneficial owner,
> director, or officer by reason of his relationship to the issuer, any
> profit realized by him from any purchase and sale, or any sale and
> purchase, of any equity security of such issuer (other than an
> exempted security) or a security-based swap agreement involving
> any such equity security within any period of less than six months,
> unless such security or security-based swap agreement was
> acquired in good faith in connection with a debt previously
> contracted, shall inure to and be recoverable by the issuer,
> irrespective of any intention on the part of such beneficial owner,
> director, or officer in entering into such transaction of holding the
> security or security-based swap agreement purchased or of not
> repurchasing the security or security-based swap agreement sold
> for a period exceeding six months.  Suit to recover such profit may
> be instituted at law or in equity in any court of competent
> jurisdiction by the issuer, or by the owner of any security of the
> issuer in the name and in behalf of the issuer if the issuer shall fail
> or refuse to bring such suit within sixty days after request or shall
> fail diligently to prosecute the same thereafter; but no such suit
> shall be brought more than two years after the date such profit was
> realized.

15 U.S.C. § 78p(b).

84.     At all relevant times, Dundon beneficially owned more than 10%

of the outstanding common stock of the Issuer and accordingly was subject to Section 16

of the Act.

85.     On November 15, 2017, Dundon purchased 759,773 shares of the

Issuer's common stock at the price of $24.00 per share.

86.     On November 15, 2017, Dundon sold 34,598,506 shares of the Issuer's common stock at the price of $27.225 per share.

87.     The sale described in paragraph 86 above occurred within less than six months of the purchase described in paragraph 85 above.

88.     The sale described in paragraph 86 above occurred at a higher price than the purchase described in paragraph 85 above.

89.     Dundon had a direct or indirect pecuniary interest in all of the shares of the Issuer's common stock purchased and sold as described in paragraphs 85-86 above.

90.     Under the "lowest-in, highest-out" method for computing realized profit pursuant to Section 16(b) of the Act, Dundon realized a profit of not less than $2,450,267 from his purchase and sale of the Issuer's common stock.

91.     Under Section 16(b) of the Act, the profit realized by Dundon as described in paragraph 90 above inured to the Issuer and remains the Issuer's lawful property, recoverable by Plaintiff in its stead, the Issuer having declined to prosecute recovery of the same despite Plaintiff's due and timely demand.

[*prayer for relief follows on next page*]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court for judgment:

(a)     Requiring Defendant Dundon to account for and pay over to the Issuer the

short-swing profit realized and retained by him in violation of

Section 16(b) of the Act in an amount not less than $2,450,267, together

with appropriate pre- and post-judgment interest and the costs of this suit;

(b)     Awarding Plaintiff her costs and disbursements including reasonable

attorney's, accountant's, and expert witness fees; and

(c)     Granting Plaintiff such further relief as the Court deems just and proper.


Dated: November 13, 2019
      New York, New York

                                HUNTER & KMIEC

                                By:  _____

                                James A. Hunter
                                255 West 94th Street, No. 10M
                                New York, New York  10025
                                Tel:     (646) 666-0122
                                Fax:    (646) 462-3356
                                E-Mail:  hunter@hunterkmiec.com

                                *Attorneys for Plaintiff*